**KIRBY McINERNEY LLP**
Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod
Karina Kosharskyy
825 Third Avenue, Floor 16
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
telrod@kmllp.com
kkosharskyy@kmllp.com

*Lead Counsel for Lead Plaintiffs*

[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BLAKE BAUER,<br><br>Plaintiff,<br><br>v.<br><br>EAGLE PHARMACEUTICALS, INC. and SCOTT TARRIFF,<br><br>Defendants. | Civil Action No.: 2:16-cv-03091-JLL-JAD<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 10

A. Lead Plaintiffs ..... 10

B. Defendants ..... 11

IV. FACTUAL ALLEGATIONS ..... 11

A. Statutory and Regulatory Framework for Prescription Drug Approval ..... 11

1. FDA Approval Process for "Pioneer" or "Innovator" Drugs ..... 11

2. FDA Approval Process for Generic Drugs ..... 12

3. The Impact of FDA Complete Response Letters ..... 16

B. An Overview of Eagle Pharmaceuticals ..... 17

C. Eagle's Development of Kangio, a "Ready to Use" Bivalirudin Product ..... 20

D. Defendants' False and Misleading Statements ..... 24

1. Prior to Submitting the NDA to the FDA, Defendants Misleadingly Described Kangio as a Liquid "Ready-to-Use" Angiomax Alternative ..... 27

2. Following the Submission of the Kangio NDA, Defendants Continued to Mislead Investors. ..... 30

3. Eagle Reinforced Materially Misleading Statements in the Weeks Preceding the Kangio PDUFA Deadline ..... 35

E. The Truth Is Revealed: FDA Rejects the Kangio Application and the Share Price of Eagle Pharmaceuticals Stock Plummets ..... 42

F. Defendants' Post-Class Period Admissions ....................................46

V. ADDITIONAL *SCIENTER* ALLEGATIONS ....................................50

VI. MATERIALITY ....................................55

VII. LOSS CAUSATION ....................................57

VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ....................................61

IX. CLASS ACTION ALLEGATIONS....................................62

X. LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ....................................64

XI. CAUSES OF ACTION....................................65

FIRST CLAIM ....................................65

SECOND CLAIM....................................68

XII. PRAYER FOR RELIEF ....................................69

XIII. DEMAND FOR JURY TRIAL....................................70

Court-appointed Co-Lead Plaintiffs Blake Bauer, Brent Kawamura and Guarang Patel (collectively, "Lead Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Eagle Pharmaceuticals, Inc. ("Eagle," "Eagle Pharmaceuticals" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Eagle Pharmaceuticals; (c) review of other publicly available information concerning Eagle Pharmaceuticals; and (d) interviews of former Eagle employees. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This federal securities class action is brought on behalf of all persons who purchased Eagle common stock between May 12, 2015 and March 18, 2016, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Act of 1934 (the "Exchange Act"), as amended by the Private

Securities Litigation Reform Act of 1995 (the "PSLRA"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

2. Eagle is a specialty pharmaceutical company that focuses on developing and commercializing injectable products. Shares of Eagle stock are publicly traded on the NASDAQ Stock Market ("NASDAQ") under the symbol EGRX. Eagle was founded in 2007 by Scott Tarriff ("Tarriff"), its current chief executive officer ("CEO"), and a seasoned pharmaceuticals industry veteran.

3. Unlike many larger, more traditional pharmaceutical companies, Eagle ***does not*** focus on developing novel drug therapies. Instead, Eagle's business model is to use the United States Food and Drug Administration ("FDA")'s 505(b)(2) New Drug Application ("NDA") regulatory pathway to develop proprietary innovations that improve upon short-comings of existing FDA-approved, injectable drugs. Cognizant of the risks associated with drug development and FDA approval process, under Tarriff's direction, the Company has focused exclusively on developing proprietary enhancements to already FDA-approved and commercially available injectable drugs under the FDA's 505(b)(2) regulatory pathway since its inception. The 505(b)(2) drug development pathway allows pharmaceutical companies to expedite the time for development, FDA review and approval.

4. This strategy, however, ***does not eliminate all*** risks associated with the FDA new drug approval process. Instead, the 505(b)(2) pathway allows drug

companies to rely, ***in part***, on the FDA's prior findings of safety and efficacy for an existing product, or published literature, in support of its application. Nevertheless, Eagle consistently touted the fact that its drug development pipeline faced comparatively less FDA approval risk because it was merely improving upon existing drugs and could rely upon the results of previous clinical trial studies to help secure FDA approval of its new drug products.

5. This litigation relates to a series of materially misleading statements and omissions concerning the Defendants' failed attempt to secure FDA approval of its ready-to-use ("RTU") liquid Bivalirudin product, formerly known as Kangio.[1] Eagle sought FDA approval of Kangio pursuant to the Section 505(b)(2) regulatory pathway.

6. Originally developed by The Medicines Company ("Medicines"), Bivalirudin is an FDA-approved drug that is marketed under the brand name Angiomax. Historically, Bivalirudin has been delivered to hospitals in powder form. Prior to being administered at the beginning of catheter laboratory ("cath lab") angioplasty procedures to prevent clotting, hospital pharmacists had to reconstitute

---

[1] On July 7, 2016, pursuant to ongoing patent litigation brought by Bivalirudin's original marketer against the Company, Eagle stipulated to abandon its trademark application for the name "Kangio" and to remove the name from its still pending FDA NDA application and to cease using the name in any and all promotional marketing material.

the drug from powder form into liquid form, before the drug was further diluted into an IV bag. As described herein, Eagle developed Kangio as a purportedly shelf-stable, liquid intravenous form of Angiomax that was ready-to-use. Eagle's development of a ready-to-use liquid form of Bivalirudin, if successful, meant that routine pharmacy compounding errors associated with the process of reconstituting Bivalirudin from powder form into liquid form could be eliminated, while the time and attention required to administer the drug could be reduced, both valuable improvements that caused excitement among analysts and investors.

7. Kangio was pitched to investors as an "improved" generic version of the already-approved Angiomax with an uncomplicated path towards regulatory approval. At the same time, however, Eagle never disclosed that Kangio was a fundamentally different product than Angiomax. In addition, Eagle ***did not*** disclose to investors that its development strategy of seeking FDA approval while minimizing costs and clinical risks was jeopardized by decisions to forgo critical human clinical studies.

8. FDA approval of Kangio was highly material to Eagle and investors. Eagle frequently touted the substantial likelihood of regulatory approval to investors. In addition, Eagle consistently described Kangio to investors as a "lucrative" opportunity to capitalize on a limited generic market for a drug whose brand sales totaled over $635 million during 2014.

9. Capturing even a fraction of the market would have been material to Eagle insofar as the Company's total revenues for 2015 were only $66.227 million. Further, analysts and investors recognized the Kangio's importance to Eagle as the Company attempted to move away from being a drug development company reliant on partnership arrangements and towards becoming an independent, commercially viable enterprise. Accordingly, analysts and investors closely monitored the Kangio FDA approval process. Critically, Eagle consistently assured investors that receiving FDA approval for Kangio was akin to checking a box, or at minimum, highly likely. That is because Kangio was purportedly merely a liquid, shelf stable form of Angiomax, which had already been approved by the FDA long ago, and because other drug companies had previously received approval to market generic versions of Angiomax.

10. On May 19, 2015, Eagle submitted its NDA relating to Kangio to the FDA. Even though Kangio was touted as an improved, liquid, shelf-stable RTU version of Angiomax, Eagle did not submit Kangio to certain additional human clinical studies. Instead, Eagle chose to rely heavily on existing results and the FDA's prior findings relating to Angiomax. By June 30, 2015, the Company had announced that the NDA had been accepted as filed by the FDA and that FDA action was due by March 19, 2016.

11. During the intervening months, Eagle continued to apprise investors of the status of the FDA review process. In particular, Eagle assured investors that the Company was engaged in an ongoing, positive dialogue with the FDA. Moreover, in the weeks leading up to an anticipated FDA decision, Tarriff and Eagle created a materially misleading impression to investors that FDA approval of Kangio was highly likely, if not a fait accompli. For example:

a. At a February 23, 2016 healthcare conference, Defendant Tarriff observed:

> ***We have every expectation that based on our file and the dialogue that's been ongoing that we'll get an approval***. So, March 19, three and a half weeks, and ***we expect to launch***. Obviously a very exciting opportunity for Eagle.

(Emphasis added).

b. Similarly, during an earnings call on February 25, 2008, Tarriff stated:

> **[W]e *currently expect to be the next entrant into this market* [*i.e.*, Bivalirudin] *ahead of other generics* . . . . *So we feel good about our chances of capturing a meaningful share of that market. We have been interacting with FDA and we are preparing for launch, everything seems to be on track for a March 19 approval, and we anticipate shipping in late Q1 or early Q2*.** . . .

(Emphasis added).

12. Unbeknownst to investors, Eagle knew, but did not disclose to investors, that additional human clinical trial studies could have provided answers, which were absolutely fundamental to Kangio's regulatory approval, and likely would have

addressed some of the FDA's current concern which ultimately prevented approval of the Kangio NDA.

13. Indeed, mere weeks later, on March 18, 2016, the Company announced that it had received a Complete Response Letter (described herein, *see* Section IV.E, *infra*) from the FDA for its Kangio New Drug Application. In its letter, the FDA requested further characterization of Bivalirudin-related substances in the drug product, expressing fundamental concerns about Kangio that discredited the Company's claim that Kangio was merely an improved generic version of the already-approved Angiomax.

14. Inasmuch as Eagle had portrayed Kangio to investors as a ready-to-use formulation of Bivalirudin, an already-approved drug marketed and sold by The Medicines Company under the Angiomax brand, and Defendants had consistently said that dialogue with FDA was positive and Kangio's imminent launch was on track, the fact that such fundamental questions derailed Kangio's approval shocked analysts following the Company, who had been misled by Eagle's and its CEO's statements concerning the nature of Kangio, the tenor of the dialogue with the FDA and the likelihood of FDA approval. On March 18, 2016, the date Eagle announced the FDA's Complete Response Letter, the surprise reverberated through the markets, prompting a $10.18 single-day drop (18.9%) of Eagle's stock price, on very high

volume. More specifically, the stock price fell from its previous closing price of $53.68 to close at $43.50 on unusually high trading volume.

15. Defendants subsequently admitted that additional expensive human testing will likely be required based on their ongoing discussions with the FDA. These studies had not been performed previously and would not have been needed if Kangio were in fact fundamentally the same as Angiomax.

16. Approximately two weeks before this bombshell announcement, while admittedly engaged in the ongoing dialogue with the FDA that culminated in the Complete Response Letter, Tarriff sold nearly 20,000 shares of Eagle stock at prices between $62.70 and $63.50 per share (roughly $20.00 per share higher than its March 18, 2016 post-corrective disclosure closing price) ─ generating proceeds of $1,250,027.96. After the FDA's Complete Response Letter was revealed, a little more than two weeks later, these shares were worth just $860,430. This highly-suspicious sale was part of a broader trend of Class Period sales by Tarriff, who sold more than 128,900 Eagle shares during the Class Period while the alleged fraud was raging, netting himself $9,505,345.01 in ill-gotten gains. Had Tarriff held these shares through the corrective disclosure, he would have netted only $5,607,151.17 or $3,898,193.84 less. Tarriff's Class Period sales strongly indicate *scienter*.

17. To date, the FDA ***still has not approved*** Eagle's NDA for Kangio. In public disclosures, Eagle has acknowledged that FDA approval ***is not*** imminent as

the Company continues to discuss with the FDA whether human testing will be required. While Eagle described the likelihood of FDA approval of Kangio as a near certainty to investors in the weeks leading up to the PDUFA date, Eagle appears to be locked in a lengthy and expensive regulatory approval process that calls into question the Company's ability to execute on its Section 505(b)(2) development pipeline, going forward. Unlike Tarriff, who sold shares at enormous profits due to the inflation of Eagle's stock due to the alleged fraud, Plaintiffs and the Class member suffered large losses that can only be recovered through this lawsuit.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information occurred in substantial part in this

Judicial District. In addition, the Company's principal executive offices are located within this Judicial District.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

22. Co-Lead Plaintiff Blake Bauer purchased Eagle Pharmaceuticals common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23. Co-Lead Plaintiff Brent Kawamura purchased Eagle Pharmaceuticals common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24. Co-Lead Plaintiff Guarang Patel purchased Eagle Pharmaceuticals common stock during the Class Period, as was detailed in a sworn certification filed previously with the Court, and suffered damages as a result of the federal securities

law violations and false and/or misleading statements and/or materials omission alleged herein.

### B. Defendants

25. Defendant Eagle Pharmaceuticals, Inc. is a specialty pharmaceutical company focused on the development and commercialization of injectable products, primarily in the critical care and oncology areas. Eagle Pharmaceuticals is headquartered in Woodcliff Lake, New Jersey.

26. Defendant Scott Tarriff was at all relevant times, the founder, CEO, president and board member of Eagle Pharmaceuticals.

## IV. FACTUAL ALLEGATIONS

### A. Statutory and Regulatory Framework for Prescription Drug Approval

#### 1. FDA Approval Process for "Pioneer" or "Innovator" Drugs

27. Pharmaceutical companies seeking to market prescription drug products are regulated by the Federal Food, Drug and Cosmetic Act ("FDCA").[2] Section 505 of the FDCA describes three types of New Drug Applications ("NDAs") that may be submitted to request marketing authorization for a new drug.

28. The application process for "pioneer" or "innovator" drugs is set forth in Section 505(b)(1). Generally, if a pharmaceutical company seeks to market a

---

[2] 21 U.S.C. § 301 *et seq*.

"pioneer" or "innovator" drug, it must first obtain FDA approval by filing a NDA with the FDA.[3] NDAs are required to contain extensive clinical and scientific data and other information, including investigative reports demonstrating the drug's safety and effectiveness, a statement of the drug's components, and specimens of proposed labeling for the drug.[4] Approval of an NDA, or a supplement to an NDA under an sNDA, requires "substantial evidence [from adequate and well-controlled investigations] that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof."[5]

**2. FDA Approval Process for Generic Drugs**

29. Pharmaceutical companies can seek to market generic versions of drugs with expired patents by submitting an application to the FDA (an Abbreviated New Drug Application or "ANDA") under The Drug Price Competition and Patent Term Restoration Act of 1984 (commonly referred to as the "Hatch-Waxman Amendments" or "Hatch-Waxman Act").[6] The Hatch-Waxman Amendments permit the submission of ANDAs for generic versions of previously approved drug

---

[3] 21 U.S.C. § 355(a), (b).

[4] 21 U.S.C. § 355(b)(1).

[5] 21 U.S.C. § 355(d)(5) *et seq*.

[6] 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271 and 282.

products,[7] and were intended to balance encouraging innovation in drug development with accelerating the availability of lower cost generic alternatives to existing drugs. The Hatch-Waxman Act created two additional marketing pathways under Sections 505(j) and 505(b)(2) of the FDCA.

30. ***Section 505(j)*** establishes an abbreviated approval process for generic versions of approved drug products through the submission of an ANDA. An ANDA provides for marketing of a drug product that has the same active ingredients in the same strengths and dosage form as the listed drug and has been shown to be bioequivalent to the listed drug. ANDA applicants are required to conduct bioequivalence testing to confirm chemical and therapeutic equivalence to the branded reference drug. Generic versions of drugs can often be substituted by pharmacists under prescriptions written for the branded reference drug.

31. ***Section 505(b)(2)*** provides for an alternate regulatory pathway that still requires an applicant to provide full reports of investigations of safety and effectiveness, but enables the applicant to rely, in part, on the FDA's findings of safety and efficacy for an existing product, or published literature, in support of its application. The FDA may then approve the new product candidate for all or some

[7] 21 U.S.C. § 355(j).

of the labeled indications for which the referenced product has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

32. Not surprisingly, the 505(b)(2) regulatory pathway has become very attractive to companies of all sizes and has been described as "low-hanging fruit" for manufacturers due to the short time of marketing with attractive returns on investment. In fact, every year FDA approves about twice as many 505(b)(2) applications as traditional 505(b)(1) applications. Moreover, while a 505(b)(1) may require more than a decade to reach NDA submission, the 505(b)(2) pathway requires a fraction of that time — a 505(b)(2) can be developed and reach FDA approval in as little as 30 months.

33. The following table, which is contained in the Form 10-K that Eagle filed on February 29, 2016, summarizes the Company's view, as expressed to its investors, as to the general similarities and differences between the various regulatory pathways:

| | ANDA | 505(b)(2) NDA | Traditional NDA |
|---|---|---|---|
| Clinical Trials/Testing Required | Only to show bioequivalence | Yes, to address potential differences between the branded reference product and the 505(b)(2) product. | Yes |
| Results in Orange Book Listed Patents | No | Yes, for novel formulations, other enhancements and new indications | Yes |
| Exclusivity | Potential for 180 days against other generic filers if first generic to file | Potential for three years for new clinical investigations (other than bioavailability and bioequivalence studies) that are essential to approval of the application. Potential for 30-month stay for Orange Book-listed patents | Potential for five years for a new chemical entity, or three years for new clinical investigations |
| Paragraph IV Certification Required | Yes | Yes | No |
| Potential orphan drug designation Drug Status | No | Yes | Yes |

34. ***Generic Drug Application and Patent Exclusivity*:** The Hatch-Waxman Act establishes periods of regulatory exclusivity for certain approved drug products, during which the FDA cannot approve (or in some cases accept for filing) an ANDA or 505(b)(2) NDA application that relies on the branded reference drug.

35. Critically, if a Section 505(b)(2) applicant's patent rights are challenged by the holder of an existing NDA, the FDA may not approve that application until the earlier of 30 months from the receipt of the notice of the paragraph IV certification, the expiration of the patent, when the infringement case concerning each such patent was favorably decided in the applicant's favor or such shorter or longer period as may be ordered by a court. This prohibition is generally referred to as the 30-month stay. Thus, approval of an ANDA or 505(b)(2) NDA ***could be delayed for a significant period of time depending on the patent certification*** the applicant makes and the reference drug sponsor's decision to initiate patent litigation.

### 3. The Impact of FDA Complete Response Letters

36. Once a NDA is accepted as complete, the FDA typically has 10 months to render a decision. Drugs with priority status have a shorter review period of 6 months. PDUFA dates are deadlines by which the FDA must review and/or approve new drug applications. These deadlines are not officially published by the FDA.

37. If the FDA determines that it will not approve a NDA in its present form, it will send the applicant a Complete Response Letter ("CRL") describing the deficiencies in the application and, where possible, providing recommendations for achieving approval going forward. Deficiencies cited by the FDA may include issues related to manufacturer site, safety, efficacy, bioequivalence (for generic drugs), quality, stability, statistical errors in the application, or proposed labeling. Applicants who receive a CRL have 12 months to respond via one of three ways—

- **Resubmission:** An applicant in receipt of a CRL can resubmit its NDA in its entirety, addressing all of the deficiencies noted in the CRL either by applying the FDA's recommendations or by employing the applicant's own solutions. Depending on the significance of these changes to the NDA, the FDA can take an additional 2 to 6 months to complete the review process.

- **Withdrawal:** An applicant in receipt of a CRL can withdraw its NDA in its entirety. Such a withdrawal is without prejudice and allows for an application to be re-filed.

- **Request an Opportunity for a Hearing:** An applicant in receipt of a CRL can request a meeting with the FDA to discuss whether there are grounds to deny the NDA. If granted, these hearings are open and public, but they do not bind the FDA to actually reconsider the application.

38. Although there are some exceptions, CRLs are typically not available to the general public because they are part of unapproved drug applications that get confidential treatment. Applicants may issue press releases announcing their receipt of a CRL, but these statements are often vague and do not disclose the full scope of the FDA's findings of shortcomings. Accordingly, even in cases where statements made in press releases match statements made in a CRL, applicants can choose what information to include and exclude at their own discretion.

**B. An Overview of Eagle Pharmaceuticals**

39. Eagle is a specialty pharmaceutical company headquartered in Woodcliff Lake, New Jersey that is focused on developing and commercializing injectable products, primarily in the critical care and oncology areas. Shares of Eagle stock are publicly traded on the NASDAQ under the symbol EGRX.

40. Eagle's CEO and founder, Scott Tarriff, was a seasoned veteran of the pharmaceutical industry prior to founding Eagle in January 2007. Previously, Tarriff served as president and chief executive officer of Par Pharmaceutical Companies, Inc. ("Par") from September 2003 to September 2006, and was also a member of Par's board of directors from 2002 to September 2006. Prior to joining Par, Tarriff was a senior director of marketing at Bristol-Meyers Squibb.

41. Despite being a publicly traded company, Eagle remains a small operation. As of December 31, 2015, Eagle had only 41 full-time and 2 part-time

employees based in the United States in addition to two full-time consultants in India. Of these 41 full-time employees, 12 were focused on research and development, 11 were focused on regulatory affairs and quality control compliance, 3 were dedicated to sales and marketing, and 15 were focused on administration and finance. The Company has historically outsourced the manufacturing of its FDA approved products and partnered with other companies during the drug development process. As Tarriff observed in a 2015 interview, Eagle's small-size enables the Company's executives to make "quicker decisions" and to see the impact of those decisions "more rapidly."[8]

42. Unlike many larger, more traditional pharmaceutical companies, Eagle ***does not*** focus on developing novel drug therapies. Instead, Eagle's business model is to use the FDA's 505(b)(2) NDA regulatory pathway to develop proprietary innovations that improve upon FDA-approved, injectable drugs.

43. More specifically, the Company attempts to develop generic alternatives to existing FDA-approved drugs that reduce or eliminate existing suboptimal characteristics. For instance, some existing drugs may be packaged inefficiently, while others come in formulations that require reconstitution or

---

[8] *See* Alice Gomstyn, "In Charge: Scott Tarriff, CEO and founder of Eagle Pharmaceuticals in Woodcliff Lake", North Jersey.com, June 28, 2015, *available at*: http://www.northjersey.com/news/business/small-pharmaceutical-company-makes-profit-reformulating-drugs-1.1364680.

dilution, or are otherwise difficult or inconvenient to prepare insofar as they expose workers to cytotoxic compounds and are susceptible to dosing errors. These suboptimal characteristics can lead to wasted quantities of drugs, inefficiencies in staff time and constrained work flow, drug mixing errors, reduced shelf life, and the need for reconstitution of multiple vials in an emergency situation.

44. Tarriff summarized the Company's development strategy during a May 3, 2014 earnings call:

> We've identified a differentiated commercialization strategy that utilizes the FDA's 505(b)(2) regulatory pathway. This approach allows us to enter the markets and convert them to our improved and prior to the first generic entrance and ahead of their 180-day exclusivity [ph] trade in some instances. ***The 505(b)(2) pathway allows us to use data generated by the in-market branded product in our NDA filing. In this way, we avoid much of the clinical trial work which significantly lowers both our R&D cost and our risk. It also means that we can benefit from a shorter time to the market because we don't face the same clinical study requirements.***
>
> The bottom line is that we can gain early market access for our products at lower costs and build and hold meaningful market share even when generics enter the market. We believe our differentiated commercialization strategy distinguishes us. We intend to commercialize our products independently in the United States. We will establish our own small specialty sales force that will target group purchasing organizations, hospital groups, and key stakeholders in acute care settings, primarily hospital and infusion centers.
>
> An important component of our overall strategy is to build intellectual property around our product. ***To date, our products are protected with strong IP foundation that now includes 11 issued and 9 filed patents, including the newly filed bivalirudin patent announced earlier this morning***.

### C. Eagle's Development of Kangio, a "Ready to Use" Bivalirudin Product

45. Bivalirudin is a direct thrombin inhibitor, administered as an IV infusion and indicated for use as an anticoagulant during coronary angioplasty procedures. In lay terms, the drug prevents blood clots during angioplasties. Bivalirudin is marketed by The Medicines Company in the United States and has been commercially available since 2000, under the NDA number N020873 and the brand name Angiomax.

46. As originally developed by The Medicines Company, Angiomax was delivered to hospitals in vials containing 250 mg of the drug in the form of lyophilized powder. Before being administered at the beginning of a catheter laboratory angioplasty procedure, the powder has to be reconstituted into liquid form and then further diluted into an IV bag. Critically, diluted Angiomax with a concentration of between 0.5 mg/mL and 5 mg/mL is only stable at room temperature for up to 24 hours, which requires hospital pharmacists to be available to reconstitute the drug on a daily basis. Despite this limitation, Angiomax became the anticoagulant market leader in angioplasties.

47. As described herein, Eagle's development of a purportedly ready-to-use liquid form of Angiomax meant that routine pharmacy compounding errors associated with the process of reconstituting powder drugs into liquid form could be eliminated, as would be the need to have hospital pharmacy staff available every day

to mix the drug. More specifically, Eagle claimed to have developed a liquid, RTU version of Bivalirudin that would be delivered to hospitals in a 250 mL vial and immediately administered to patients without having to rely on pharmacists to reconstitute the drug from powder to liquid form. The Company claimed that this RTU formulation would save time and reduce risks of dosing errors during reconstitution, in addition to avoiding situations where no licensed pharmacist is available (for example, during late-night shifts, when nurses or other healthcare providers might be required to mix the drug themselves). Furthermore, the Company claimed that its liquid, RTU version of Bivalirudin would have a shelf life exceeding 12 months, considerably longer than Angiomax's shelf life.

48. The following slide, included in an Eagle presentation dated February 23, 2016 (but consistently included in other corporate presentations), summarizes the claimed benefits of Kangio compared to Angiomax, the brand formulation. What is clear is that Eagle consistently sought to minimize the significant differences that existed between its RTU Bivalirudin candidate, Kangio, and Angiomax.

## Multiple Benefits vs. Angiomax

| | RTU Bivalirudin | Angiomax[1] |
|---|---|---|
| API | Bivalirudin | Bivalirudin |
| Formulation | Ready-to-Use Liquid | Lyophilized Powder |
| Administration | IV Solution | IV Solution |
| Reconstitution Required? | NO | Yes |
| Initial Dilution Required? | NO | Yes |

Immediate administration
- ✓ Increases work flow
- ✓ Reduces risk of dosing errors

11 [1] Angiomax® (bivalirudin) / Angiox® (bivalirudin) (The Medicines Company)

EAGLE PHARMACEUTICALS

49. As summarized by the following slide taken from the same Eagle overview presentation, Eagle described Kangio as a "stable, liquid intravenous formulation of Angiomax" that was poised to enter the generic market as an improved formulation and at a time when competitors were locked in protracted patent litigation. Despite these plus factors, Eagle was still required to convince the FDA to approve a new formulation of a drug that was not shelf stable in its original form. Yet, Eagle pitched this formulation as highly likely to be approved to investors despite privately knowing that attempts to minimize costs and avoid undertaking certain clinical trials would make achieving regulatory approval more challenging.




50. Developing a generic alternative to Angiomax was one of Eagle's earliest projects, having launched this initiative in June 2007, a mere six months into its existence. Recognizing the success of Angiomax, Eagle engaged a third-party market research firm, Phoenix Marketing International, to perform market research on whether hospital stakeholders would be receptive to a liquid, ready-to-use formulation of Bivalirudin. Hospital nurses and pharmacists provided feedback suggesting that such a product would promote more efficient work flows and the ability to more quickly and flexibly administer the drug in a variety of settings.

51. Accordingly, in June 2007, Eagle entered into a development and license agreement with SciDose, LLC ("SciDose") in which SciDose assigned Eagle

certain patents relating to Argatroban, Bivalirudin, and two additional products. Subsequently, Eagle entered into a development agreement with The Medicines Company, Angiomax's developer, in May 2008 (the "Development Agreement"). Pursuant to the terms of the Development Agreement, The Medicines Company and Eagle collaborated by developing, testing, and analyzing numerous RTU formulations of Angiomax. After ongoing disputes about the parties' obligations under the Development Agreement, the parties went to arbitration and a decision was issued on July 19, 2013. Eagle terminated the Development Agreement with Medicines on October 3, 2013.

52. Following the termination of The Medicines Company Development Agreement, Eagle independently continued its development of the liquid ready-to-use Bivalirudin alternative. In the weeks immediately following the termination, Eagle scheduled and held a "Type C" meeting with the FDA on November 3, 2013. During this meeting, Eagle discussed its expected product attributes of Kangio and its development timeline. Subsequently, the Company continued to develop Kangio, working with third-party development partners, in anticipation of filing a NDA pursuant to Section 505(b)(2).

**D. Defendants' False and Misleading Statements**

53. Throughout the Class Period, Eagle repeatedly touted to investors its ability to develop new drugs at "low costs" and at comparatively "lower clinical

risks" pursuant to the Section 505(b)(2) regulatory pathway. Yet, the Company's development of Kangio belies the accuracy of this strategy.

54. More specifically, during the Class Period, Eagle consistently described to investors that its development of Kangio was just another example of how the Company planned to exploit the FDA's 505(b)(2) NDA regulatory pathway to develop proprietary innovations that improve upon FDA-approved, injectable drugs. Defendants repeatedly emphasized the similarities between Kangio and Angiomax, which militated heavily towards smooth regulatory approval. That is because Kangio was described as a liquid "ready-to-spike" version of Angiomax.

55. In addition, Defendants represented that they remained in constant communication with the FDA during the regulatory review process, while at the same time expressing their belief that Kangio would imminently launch on-time as expected. Thus, Defendants repeatedly and confidently predicted that the Company would receive FDA approval for its liquid, ready-to-use Bivalirudin product. Based on Defendants' representations, investors shared Defendants' confidence. Consequently, investors believed that Eagle was poised to capitalize on a "lucrative" opportunity to enter the generic Bivalirudin market after the March 19, 2016 FDA PDUFA date.

56. Unbeknownst to investors, however, considerable differences between Kangio and Angiomax (as well as other generic forms of Bivalirudin) existed. In

addition, Defendants forewent the opportunity to conduct certain additional human clinical trial studies, which the FDA has signaled would be required to demonstrate that Kangio was an appropriate candidate for regulatory approval. Instead, Defendants took its "low cost" development strategy to an extreme, relying heavily on prior clinical trial studies as opposed to the results of new clinical trial studies that could have bridged the gap between Kangio and Angiomax.

57. Consequently, and unbeknownst to investors, the risks of Kangio being denied regulatory approval were far greater than Defendants presented during the Class Period. These undisclosed risks only became apparent following the Company's March 18, 2016 announcement that the FDA had rejected the Kangio NDA because it required "further characterization of bivalirudin-related substances" in Kangio. In the aftermath of the FDA's denial, Defendants finally acknowledged the significant differences between Kangio and Angiomax. More specifically, Defendants acknowledged that Eagle failed to provide the results of sufficient clinical trial studies to warrant regulatory approval. In addition, the fact that additional human testing would likely be required prior to FDA approval renders materially misleading the fact that Kangio was merely a liquid "ready-to-spike" version of Angiomax. In addition, Defendants were forced to concede that they sought approval of Kangio as quickly and cheaply as possible.

### 1. Prior to Submitting the NDA to the FDA, Defendants Misleadingly Described Kangio as a Liquid "Ready-to-Use" Angiomax Alternative

58. Since becoming a public company in 2014, Eagle consistently apprised investors of its progress in developing a ready-to-use Bivalirudin product. As the development process neared completion in early 2015 and the Company geared up to submit a NDA to the FDA, the Company's description of Kangio and the factors weighing in favor of regulatory approval became more specific.

59. For example, during the listen-only portion of the May 12, 2015 earnings call, Eagle's chief financial officer David Riggs ("Riggs") stated, "We are very pleased that in the near future we will be submitting a second NDA, requesting marketing approval for our bivalirudin product candidate." After taking over from Riggs, Tarriff provided a more detailed overview of the product and its anticipated launch date, falsely and misleadingly stating:

> So let's move now on to our ready-to-use or RTU bivalirudin candidate. This product is our enhanced, ready-to-use version formulation of bivalirudin, ***the same ingredient as in the Medicines Company's anticoagulant Angiomax***, which had U.S. sales of over $600 million in 2014. ***Bivalirudin is a unique product***. . . . Today, when a patient presents in a hospital, the second and sometimes third shift cath lab nurse must reconstitute the lyophilized powder, Angiomax, based on the weight of the patient. ***This is done in the cath lab, not in the pharmacy, and this manipulation outside the pharmacy just makes everyone nervous. Our RTU bivalirudin is a stable, liquid, intravenous, ready-to-use, liquid formulation.*** It requires no manipulation. ***The nurse can simply spike it, and hey, we believe this will be a key driver of adoption for our product, assuming FDA approval.***

* * * *

> So to recap, we have several important milestones in the near future that we expect will build value. ***We will file the NDA for RTU bivalirudin in the very near future and would expect its acceptance for filing by the end of July and our PDUFA date should be 10 months after filing.***

(Emphasis added).

60. During the question and answer portion of the same call, Tarriff fielded a series of questions regarding the Kangio development process. Presumably based on prior representations that Kangio was "a stable, liquid, intravenous, ready-to-use, liquid formulation" of an existing product, the questions focused on the potential for patent litigation initiated by The Medicines Company, rather than the likelihood that Eagle's Kangio NDA would be rejected due to the Company's inadequate clinical trial studies. Tarriff specifically observed:

> [I]t's very hard to predict what Medicines company will do in these situations. Perhaps it's a better question for them, but for our viewpoint, as we've spoken in the past, we believe we have very strong patent position to get this drug on the market quickly, hopefully next year. ***And I think if the market is genericized and the Appellate Court has ruled in favor of a generic, it should be an easier path for us to get to the market and we are doing everything we can to be prepared to bring that product to the market in 2016.***

61. Likewise, in response to a question from another analyst regarding pending litigation between Hospira, Inc. ("Hospira") and The Medicines Company,[9] Tarriff downplayed the risk associated with patent litigation based on the Company's prior litigation success: "we're cognizant of that but we're going to do everything we can, and we ***think we have a good position to get us through and on to the market as soon as we possibly can.***" (Emphasis added).

62. The preceding statements described in paragraphs ¶¶ 59-61 were materially misleading insofar as Defendants described Kangio as "a stable, liquid, intravenous, ready-to-use, liquid formulation" of Angiomax despite being aware of significant differences between the two products. Further, Defendants were privately aware that by foregoing certain human clinical trial studies, and choosing instead to submit a NDA based on the results of limited new testing, the likelihood that the FDA would deem Kangio to be both effective and safe based on the information that would be included in the forthcoming NDA was diminished. Accordingly, Defendants' pitch to investors that the Section 505(b)(2) pathway "expedites time for development, FDA review, and approval" was materially misleading, at least with respect to Kagnio.

[9] *See The Medicines Company v. Hospira, Inc.*, No. 2014 Civ. 1469, 2014 Civ. 1504 (D.C. Cir.).

### 2. Following the Submission of the Kangio NDA, Defendants Continued to Mislead Investors.

63. Following its submission of an NDA for Kangio in May 2015, on July 23, 2015, Eagle submitted a Form 8-K to the SEC annexing a press release touting the fact that the FDA had accepted the Kangio NDA for filing. In addition to announcing the FDA's March 2016 PDUFA date, the press release described how the Company planned to remain in close contact with the FDA and expected that its application would be well received. In fact, Tarriff observed that

> We look forward to the FDA's decision on this NDA in March 2016 and, if approved, intend to launch our RTU bivalirudin product the following day. . . . We expect our RTU liquid formulation will be well received due to its multiple differentiating features. ***We look forward to continuing to work closely with the FDA through the review process.***

(Emphasis added).

64. This statement was materially false and misleading because it ***did not*** disclose that the Kangio NDA was materially insufficient insofar as it ***did not*** include sufficient information, including human clinical trial results, to overcome the divide between Kangio and Angiomax to warrant FDA approval as currently constituted.

65. Eagle and Tarriff continued to express unbridled optimism regarding the likelihood of Kangio receiving FDA approval during the earnings call held on August 11, 2015. While Defendants were quick to highlight Kangio's competitive advantages and to express their purported then-held belief and expectation that

Kangio was launching in March 2016, they did not represent that these differences presented significant hurdles to FDA approval:

> Now, moving onto our ready-to-use or RTU bivalirudin candidate, we filed the NDA during the second quarter, and we look forward to FDA's decision in March of 2016. This product is our enhanced ready-to-use version formulation of bivalirudin, the same ingredient is in the [M]edicine[s] [C]ompanies anticoagulant Angiomax, which had U.S. sales of over $600 million in 2014. ***Unlike Angiomax and potential generics, our RTU bivalirudin is a stable liquid ID ready-to-use liquid formulation, it requires no manipulation. The nurse can simply spike it and hang it, and we believe this will be a key driver of adoption of our product assuming FDA approval.***
>
> * * * *
>
> ***<u>We expect</u> to launch RTU bivalirudin in March and followed by RTD bendamustine in the 500 ML bag early May of next year.***

66. During the question and answer portion of the call, Tarriff's optimism remained unchecked. In response to an analyst's question regarding the drug's market opportunity, Tarriff reiterated Defendants' purported then-held belief regarding Kangio's approval and market penetration and explained that the likely approval mandated building up a sales force capable of marketing the product to key constituencies:

> ***I think on bivalirudin, we should do very well. If things go according to plan and part of the reason why we need a sales-force.***
>
> We need to be speaking to hospital pharmacy, reminding them of the value of a ready-to-use product that is reconstituted primarily in the cath lab. ***So we believe we will gain very strong market share with this product. It should be sticky. . . .***

67. The preceding statements in paragraphs ¶¶ 63-66 were materially misleading insofar as Defendants were privately aware that by foregoing certain human clinical trial studies, and by choosing instead to submit a NDA based on the results of limited new testing, the likelihood that the FDA would deem Kangio to be both effective and safe based on the limited information that would be included in the forthcoming NDA was diminished. Accordingly, even though Defendants expressed their purported then-held beliefs that "We expect to launch RTU bivalirudin in March" and that "we believe we will gain very strong market share with this product", Defendants did not accurately represent the significant risks that materially decreased the likelihood that the Kangio NDA would be approved by the FDA.

68. During a November 11, 2015 earnings call, Tarriff continued to state that the RTU Bivalirudin FDA approval process was on track, expressing Defendants' purported then-held belief and expectation as to FDA approval in March 2016, noting: "We disclosed last quarter that Eagle had filed an NDA for this product, and ***we continue to expect an FDA decision in March of 2016***." (Emphasis added). Tarriff also continued to blur the lines between receiving FDA approval and immediate commercialization of the product by highlighting how Eagle was poised to take advantage of a contracted sales force in addition to building out the Company's own independent sales team.

69. On November 19, 2015, and on the heels of a favorable ruling in litigation concerning a competitor's generic Angiomax formulations, Tarriff created the impression that Eagle's own Bivalirudin product would soar and that FDA approval was forthcoming. However, Tarriff failed to communicate that considerable differences between Kangio and Angiomax (in addition to other generic forms of Bivalirudin) existed, making FDA approval significantly less likely. Instead, Tarriff repeatedly emphasized the similarities between Kangio and Angiomax, which militated towards regulatory approval.

> There's been a lot of discussion now about our Bivalirudin product, a lot of news broke on Friday afternoon as I was getting on the plane to come here. Angiomax, the medicines company $635 million brand last year when it was still a branded product. ***Generic competition has entered the market recently. We filed our NDA back in May, our PDUFA date is March 19th of next year. So, we're right around the corner there as well.***
>
> * * * *
>
> . . . . [W]hat we invented was a ***liquid ready-to-use Bivalirudin product, it requires no reconstitution***, it requires no manipulation anyway, you just spike it, hang in, avoid all those troubles with the late shift nurses and again, the plan is to sell this product at about the generic price, the hospital pharmacist is our call point, that's where we are, that's our call point at Eagle, that's where we sell to. . . .
>
> . . . . Generics won the case on appeal earlier in the year came to the market, as of Friday afternoon that decision has been vacated basically opens up this market one more time. ***And I think this is going to be going on for quite a while, maybe through all of next year, but what it means for Eagle is that first we were never sued, so we have <u>a clear path to get to the market from the 19th March</u>, expect to get to the market and it could be, right, we'll have to see how things unfold, but***

> ***could be that this is a much more limited market than we expected to be two weeks ago.***
>
> ***Obviously less competition in the market better for us and exciting times.***

(Emphasis added).

70. The preceding statements in paragraphs ¶¶ 68-69 were materially misleading insofar as Defendants continued to perpetuate the beliefs that Kangio was simply a "liquid ready-to-use Bivalirudin product" that "require[d] no reconstitution" and that FDA approval and "a clear path to market" were just "around the corner". Nevertheless, Defendants continued to omit that the significant differences between Kangio and Angiomax existed, and that based on their ongoing dialogue with the FDA, by foregoing certain clinical human studies the likelihood that the FDA would approve the Kangio NDA as then-submitted was substantially reduced.

71. Based on Defendants' misleading statements and omissions, analysts and investors fully expected that Kangio would receive FDA approval shortly after the March 19, 2016 PDUFA date. For example, on January 6, 2016, RBC analysts published research notes following a dinner with Eagle's management team. In a research noted entitled, "Management dinner focused on catalyst heavy path", RBC analysts emphasized that they fully expected that Kangio would receive approval based on their conversations with Eagle management. More specifically, RBC

observed, "Bivalirudin could add >$20 in NPV under a favorable scenario versus the conservative $3 we have in our model and EGRX fully expects to launch following the Mar 19 PDUFA." In a separate note published the same day, RBC stated that Eagle's RTU Bivalirudin product was a source of "upside potential" that would drive share price appreciation.

72. Likewise, these perspectives were further reflected in a research note that RBC published on February 16, 2016, wherein analysts reiterated that based on Defendants' prior statements they believed that Eagle would "launch its RTU bivalirudin on Mar 19" and that an "Outperform" rating was warranted.

### 3. Eagle Reinforced Materially Misleading Statements in the Weeks Preceding the Kangio PDUFA Deadline

73. In the weeks leading up to an anticipated decision from the FDA on a NDA for an "improved" existing drug, the confidence that Eagle and Tarriff previously demonstrated devolved into brazen overstatements that created a materially misleading impression to investors that Kangio was not a major departure from Angiomax, which after all had the "same ingredient", and consequently that FDA approval of Kangio was highly likely, if not a fait accompli.

74. In making these statements, Defendants falsely and misleadingly reinforced the impression that the ongoing dialogue with the FDA was positive, which supported the notion that the NDA was strong and complete, and indicated that Kangio would be approved as expected in March 2016. Defendants falsely and

misleadingly omitted to disclose their awareness that receiving FDA approval by the March 19, 2016 PDUFA date was not substantially likely.

75. Defendants' private awareness of such undisclosed, material facts concerning the likelihood that the FDA would not approve Kangio rendered Defendants' public statements during the Class Period concerning these matters, detailed below, materially misleading.

#### a. February 23, 2016 RBC Global Healthcare Conference

76. On February 23, 2016, Eagle presented a Corporate Overview to analysts and investors at the RBC Capital Markets 2016 Global Healthcare Conference. In response to a question regarding Kangio's FDA action date and expectations to launch the drug, Tarriff responded:

> ***We are in dialogue with FDA, as you would expect coming down to the final weeks before approval. We have every expectation that based on our file and the dialogue that's been ongoing that we'll get an approval***. So, March 19, three and a half weeks, and ***we expect to launch***. Obviously a very exciting opportunity for Eagle.

77. In addition, Tarriff reassured investors that the imminent Kangio launch presented a fortuitous market position by stating, "[R]ight now, the market is shaping up to be ***far more valuable*** than we thought four months ago." (Emphasis added). He supported this assessment by describing how the ongoing Hospira-Medicines litigation presented an opportunity for Kangio to be the next generic entrant in a market.

78. Tarriff further explained, "we have a product that we consider far superior to the other generics on the market." Tarriff represented that Eagle would have the "bandwidth to fully cover" the over 300 hospitals and cath labs that currently used Angiomax in the United States. Moreover, Tarriff downplayed any risk associated with The Medicines Company's lawsuit against Eagle seeking to block Kangio from coming to market, describing the issues at stake as ones that were previously litigated and resolved.

79. Accordingly, Tarriff confidently expressed that the Company would be able to exploit a "very lucrative situation" through at least the end of 2016. Collectively, these statements created the impression that the launch of Kangio was imminent and positioned to generate results far exceeding prior expectations. This perspective was reinforced by an accompanying slide presentation, which stated that Kangio was "likely next entrant in [a] limited market" and one of "7 products marketed by May 2016 addressing large markets."

80. In addition, as highlighted by the following slide, Defendants' statements concerning the likelihood of Kangio receiving FDA approval were materially misleading insofar as they drew a false equivalence between Kangio and Angiomax by describing Kangio as a "Ready-to-Use" liquid version. Accordingly, Defendants omitted to disclose that by foregoing additional human clinical trial studies the Company provided the FDA with an insufficient basis to evaluate the

efficacy and safety of Kangio, making it less likely that the drug, which was more different from Angiomax than previously disclosed, would receive FDA approval based on the information submitted in its 505(b)(2) application.

## Multiple Benefits vs. Angiomax

| | RTU Bivalirudin | Angiomax[1] |
|---|---|---|
| API | Bivalirudin | Bivalirudin |
| Formulation | Ready-to-Use Liquid | Lyophilized Powder |
| Administration | IV Solution | IV Solution |
| Reconstitution Required? | NO | Yes |
| Initial Dilution Required? | NO | Yes |

Immediate administration
✓ Increases work flow
✓ Reduces risk of dosing errors

EAGLE PHARMACEUTICALS

11 [1] Angiomax® (bivalirudin) / Angiox® (bivalirudin) (The Medicines Company)

81. The statements in the preceding paragraphs ¶¶ 76-80 were materially misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information by continuing by continuing to describe Kangio as a "Ready-to-Use" liquid version of Angiomax that was likely to receive FDA approval based on the positive ongoing dialogue with regulators. More specifically, the following statements were materially misleading:

a. Defendants represented that they were "in dialogue with FDA, as you would expect coming down to the final weeks before approval" and that they had "every expectation that based on our file and the dialogue that's been ongoing that

we'll get an approval." This statement was materially misleading insofar as Defendants falsely and misleadingly reassured investors that, based on a positive ongoing dialogue with the FDA, Kangio would likely received FDA approval in March 2016 despite Defendants' own awareness that differences between Kangio and Angiomax in addition to insufficient clinical trial studies made receipt of such approval considerably less likely.

b. In addition, Defendants' statements that they expected to exploit a "very lucrative situation" that "the market [was] shaping up to be far more valuable than we thought four months ago", and that Kangio was "likely next entrant in [a] limited market" were materially misleading insofar as Defendants were attempting to reassure investors that Kangio would receive approval mere weeks away from the PDUFA date, relying heavily on the purported ongoing dialogue with the FDA, despite privately recognizing that differences between Kangio and Angiomax in addition to insufficient clinical trial studies made receipt of such approval considerably less likely.

**b. February 25, 2016 Earnings Call**

82. On February 25, 2016, the Company issued a press release announcing its financial results for the fiscal year and quarter ended December 31, 2015. The Company announced an increase in total revenue and product sales compared to the three months ended December 31, 2014.

83. During a conference call held on the same day, Tarriff stated:

> Next up is our PDUFA milestone on March 19[, 2016] for Kangio or RTU bivalirudin which is less than three weeks from now. Based on the Appellate Court's decision being vacated on Angiomax ***we currently expect to be the next entrant into this market ahead of other generics***…***So we feel good about our chances of capturing a meaningful share of that market.***
>
> ***We have been interacting with FDA and we are preparing for launch, everything seems to be on track for a March 19 approval, and we anticipate shipping in late Q1 or early Q2***…[t]he important point to keep in mind is that we will likely be the next entrant into this limited market…

(Emphasis added).

84. During the question and answer portion of the call, Tarriff presented Kangio to investors as an exemplar of the type of product that Eagle would continue to develop. In response to a question from an analyst, Tarriff noted, "***And we've done it by developing products that have low clinical risk and relatively low cost of development . . . . And as we look at our pipeline, we believe that the opportunities to continue to develop products like bivalirudin. . . . .***"

85. The statements in the foregoing paragraphs ¶¶ 82-84 were materially misleading and/or omitted to state material facts requisite to render them not misleading, for failure to disclose the information by continuing by continuing to describe Kangio as likely to receive FDA approval based on the positive ongoing dialogue with regulators. More specifically, the following statements were materially misleading:

a. Defendants represented that they had "been interacting with FDA and we are preparing for launch" and suggested that "everything seem[ed] to be on track for a March 19 approval" but did not convey that the FDA had privately expressed concerns regarding the Kangio NDA, including but not limited to the fact, that Eagle forewent the opportunity to bridge the gap between Kangio and Angiomax by presenting the results of additional clinical human studies.

b. In addition, Defendants described Kangio as example of how Eagle could successfully develop products under the Section 505(b)(2) regulatory pathway with "low clinical risk" and a "relatively low cost of development", but omitted to disclose that differences between Kangio and Angiomax, coupled with Defendants' shoestring development strategy, caused Defendants to privately recognize that the likelihood that Kangio would receive regulatory approval was substantially decreased.

86. Collectively, Defendants' remarks during the February 25, 2016 earnings call underscore that in the weeks before the March 19, 2016 PDUFA deadline the Company signaled to investors that it believed regulatory approval of Kangio was highly likely, if not a fait accompli. Rather than focus on the cognizable risks suggesting that the Kangio NDA would not be approved Eagle and Tarriff shifted investor focus towards whether the Company would be able to capitalize on

a "lucrative" market opportunity – one that they claimed was more promising than previously envisioned.

### E. The Truth Is Revealed: FDA Rejects the Kangio Application and the Share Price of Eagle Pharmaceuticals Stock Plummets

87. On March 18, 2016, Eagle published a press release prior to market open at 6:50 a.m. (Eastern) announcing that the FDA issued a Complete Response Letter determining that the Kangio NDA could not be approved in its current form and that additional information was required.[10] The press release, in relevant part, stated:

> WOODCLIFF LAKE, N.J.--(BUSINESS WIRE <http://www.businesswire.com/>) - Eagle Pharmaceuticals, Inc. (NASDAQ: EGRX) ("Eagle" or the "Company") today announced that it has received a Complete Response Letter from the U.S. Food and Drug Administration (FDA) for its KANGIO(TM) (bivalirudin injection), 505(b)(2) New Drug Application for a ready-to-use ("RTU"), stable liquid intravenous formulation of 5 mg/mL bivalirudin in a 50-mL vial intended for use as an anticoagulant in patients: (1) undergoing percutaneous coronary intervention ("PCI") with use of glycoprotein IIb/IIIa inhibitor, (2) undergoing PCI with, or at risk of, heparin-induced thrombocytopenia ("HIT") and thrombosis syndrome ("HITTS"), and/or (3) with unstable angina undergoing percutaneous transluminal coronary angioplasty ("PTCA").
>
> ***The FDA issues Complete Response Letters to communicate that their initial review of an application is complete; however, they cannot approve the application in its present form and request additional information. In its letter to Eagle, the FDA requested***

[10] As described above, complete response letters are treated as confidential by the FDA and are typically not made publicly available. Here, Eagle has not released the complete response letter to investors. On October 24, 2016, the FDA denied Lead Counsel's Freedom of Information Act request for the letter.

> ***further characterization of bivalirudin-related substances in the drug product. Eagle will work directly with the FDA to determine an appropriate path forward to address the comments.***
>
> "We are evaluating the FDA's response and will work closely with the agency to better understand and address their comments regarding Kangio," said Scott Tarriff, President and Chief Executive Officer of Eagle Pharmaceuticals. "We remain committed to Kangio as an important new formulation of bivalirudin for intravenous use, offering multiple benefits for patients and care givers," concluded Tarriff.

(Emphasis added).

88. The share price of Eagle stock reacted sharply to this news declining by $10.18 (or 18.9%) from the March 17, 2016 closing price of $53.68 to close at $43.50. The intra-day low was $40.50. In addition, the volume of trading spiked to over 2.499 million shares, or more than 4 times the prior day's trading volume.

89. Further, research analysts directly attributed this sharp share price decline to the unexpected denial of the Kangio NDA. For example, on March 18, 2016, *i.e.*, the same day that the Company announced the FDA Complete Response Letter, Piper Jaffray published a research note describing how the unexpected delay in obtaining approval negatively impacted its valuation of Eagle and lessened the likelihood that the Company would be able to maximize its share of the generic market:

> Not yet clear to us if the delay on Kangio will only turn out to be a short-term setback. ***The FDA noted in the CRL that additional information regarding bivalirudin related substances in the drug product would be needed.*** EGRX made it clear that it does not yet have clarity on a path forward and will need to engage in further dialogue

> with the agency. Without knowing more specifics, we are most likely looking at a 2017 launch at the earliest for Kangio. Further, given that delay, it is not clear if the bivalirudin market dynamics will be as favorable for EGRX in 2017 as they are now (*i.e.*, Hospira is the only generic on the market, and the given the uncertainty at the appellate level, it is not clear if we will see additional entrants later this year or next year; this is bearing in mind that the lower court invalidated the patents in question). ***Put another way, the delay raises the risk that EGRX, assuming it eventually is in a position to enter the bivalirudin market, will be facing a diminished Kangio opportunity down the road.***

(Emphasis added).

90. Piper Jaffray also pushed back its "expected launch date" for Kangio while cutting its forecast of revenues tied to Kangio during fiscal year 2016 and the next three years.

> Our new [Price Target] (down from $121) is based on a P/E of 15x (down from 16x) our 2018 (unchanged) EPS estimate of $8.31 (down from $9.14), discounted by 13% (up from 10%) for two years. Our lower EPS estimate reflects lower contribution from Kangio in 2017 and 2018 (we are modeling a 2017 launch). Our model had previously reflected a 2016 launch, but also had reflect the negative impact of additional market entrants (hence the relatively limited impact to our EPS estimates in 2017 and 2018). ***The higher discount rate more appropriately reflects the risks surrounding Kangio, and the lower P/E multiple is a better reflection of broader market realities for the specialty pharma space. . . .***

(Emphasis added).

91. Piper Jaffray's revised forecast for Eagle's Kangio-related revenue translated to Eagle earning 62% less in total revenue, or $159 million less between the first anticipated 2016 launch and the close of 2019.

Exhibit 1

Current versus Prior Estimates

| $ in millions, except per share | FY 2016E Current | FY 2016E Prior | FY 2017E Current | FY 2017E Prior | FY 2018E Current | FY 2018E Prior | FY 2019E Current | FY 2019E Prior |
|---|---|---|---|---|---|---|---|---|
| *Revenues* | | | | | | | | |
| EP-3102 Royalty Revenue | $136 | $136 | $143 | $143 | $142 | $142 | $142 | $142 |
| EP-3101 (ready-to-dilute form of bendamustine) | $80 | $80 | $152 | $152 | $169 | $169 | $179 | $179 |
| Ryanodex (dantrolene) - MH | $9 | $9 | $17 | $17 | $22 | $22 | $25 | $25 |
| Ryanodex (dantrolene) - EHS | $0 | $0 | $0 | $0 | $48 | $48 | $81 | $81 |
| Kangio revenues | $0 | $74 | $27 | $79 | $35 | $74 | $35 | $29 |
| Argatroban revenues | $3 | $3 | $2 | $2 | $2 | $2 | $2 | $2 |
| Other sales/revenues [1] | $13 | $13 | $22 | $22 | $20 | $20 | $20 | $20 |
| **Total Revenues** | **$240** | **$314** | **$364** | **$416** | **$439** | **$478** | **$484** | **$478** |
| Consensus [2] | $268 | | $366 | | $412 | | | |

92. Other analysts were similarly shocked at the FDA's decision based on the Company's prior guidance. On March 18, 2016, RBC published a research update entitled, "EGRX Complete Response Letter for KANGIO an incremental negative," which stated:

> EGRX announced this morning that it has received a Complete Response Letter (CRL) for KANGIO, its ready-to-use version (RTU) of bivalirudin. It had been targeting The Medicines Company's ANGIOMAX (bivalirudin, ~$600 million brand) with an improved version that is RTU and that requires no reconstitution and dilution. The CRL is unexpected and we had modeled a KANGIO launch shortly after the Mar 19 PDUFA. . . . Our model has base case NPV of $6 built in for KANGIO with the upside case (>$20 in NPV) involving the removal of all generics on favorable litigation resolution for The Medicines Company and launch by EGRX.

93. On March 21, 2016, RBC published an in-depth follow-up research piece entitled, "Post Friday's sell-off; more meaningful catalysts still ahead and near-term," which echoed prior research. More specifically, RBC, like Piper Jaffray, removed Kangio from its Eagle financial model and reduced its target share price:

> We have removed KANGIO from our model following the Complete Response Letter (CRL) update reducing our target by $6 to $94. The CRL at a minimum pushes out an anticipated near-term launch (link). We spoke with EGRX on Fri and while we expect the company to talk to the FDA in the near-term, until that happens it's going to be challenging to predict the timing and path to market. For now, we have removed KANGIO to be conservative though presumably the product has value even in a worst case scenario where it enters late into a genericized market given its RTU differentiation.

94. On the same day, shares of Eagle continued to decline—falling $2.26 from the prior day's closing price of $43.50 to close at $41.24.

**F. Defendants' Post-Class Period Admissions**

95. To date, Eagle has not released the FDA's Complete Response Letter. Accordingly, Eagle's public statements regarding the FDA's letter provide the only basis for assessing the reasons for the FDA's denial.

96. In the weeks and months following the Company's initial announcement of the FDA's Complete Response Letter, Eagle has made a series of post-Class Period disclosures acknowledging: (i) that the Company internally recognized that Kangio was materially different than Angiomax; (ii) that the Company's strategy of pursuing low cost, low risk development of Kangio was flawed insofar as further human clinical trial studies would have provided the FDA a basis to bridge the divide between the products and warrant regulatory approval; and (iii) that in light of the foregoing approval of Kangio is not imminent, in

contravention of prior misleading statements that the Company made regarding the high likelihood of approval and commercialization this year.

97. For example, on March 31, 2016, Eagle held a "Business Update" call with analysts and investors. Tarriff and the Company's current Chief Medical Officer, Dr. Adrian Hepner ("Dr. Hepner") addressed the FDA's denial of Kangio with conciliatory tones. More specifically, Tarriff acknowledged that the Kangio rejection marked a departure from the Company's prior successes, while also conceding that Eagle sought approval of Kangio as quickly and cheaply as possible:

> Unfortunately, we also received a complete response letter for Kangio, which is not consistent with the past successes that we've had from a clinical and regulatory standpoint. We've requested a meeting with the FDA, and we are presenting our thoughts to them on Kangio. ***We won't have a further update for you today, but we will soon as we have our meeting with FDA. It's important to note that we've accomplished all of this without running any long duration expensive clinical trials.*** Our clinical philosophy has been to minimize those risks and costs.

98. While Eagle minimized costs and avoided "long duration expensive clinical trials," the Company presented Kangio as a product that did not warrant such measures. After all, Kangio was simply supposed to be a "ready to use" liquid version of an existing drug.

99. Further, during the call, an analyst questioned whether the Company needed to speak with the FDA based on the seemingly limited amount of work required to obtain approval. In response, Dr. Hepner avoided providing a concrete approval timeline while explaining that the Company still needed to meet with the

FDA to better understand why the Kangio NDA was rejected—contrary to prior guidance that the Company expected that it was highly likely for the application to be approved based on its previous conversations with the FDA and the product brought to market during 2016. More specifically, Dr. Hepner stated:

> . . . . ***Well, our philosophy is to what with the FDA, meaning we would like to engage them in a dialog*****[ue]** ***to better understand reasons they may have for the complete response letter, and also for them to understand our position before getting all the documenting.*** I think it's a good practice to engage our regulators in a fruitful discussion and not the other way around. So we mean we work together, we get the product approved, and we launch it into the market.

(Emphasis added).

100. This preceding statement contradicts prior representations that Defendants were engaged in an ongoing dialogue with the FDA. It also raises serious questions regarding the accuracy of prior representations regarding development milestones, more generally.

101. On August 9, 2016, Eagle filed a Form 10-Q for the quarter ending June 30, 2016 with the SEC. In this Form 10-Q, Eagle disclosed that it was continuing to work with the FDA to provide the agency with the information required to further consider the Kangio NDA:

> On March 18, 2016, the Company received a Complete Response Letter from the FDA for EP-6101 ready-to-use ("RTU") bivalirudin ("EP-6101") in which the FDA stated it cannot approve the application in its present form and requested additional information from the Company. ***Discussions with the FDA to identify an appropriate pathway to approval are ongoing and could include a human study.***

102. The fact that human studies were now being discussed, 5 months after the PDUFA date, underscores that Kangio was not merely a liquid form of Angiomax or that regulatory approval was likely. Accordingly, the Company's representations to that effect were materially misleading.

103. On August 10, 2016, Eagle held an earnings call and filed a Form 10-Q for the quarter ending June 30, 2016 with the SEC. During this call, Tarriff and the Company minimized discussion of its Kangio travails while touting its other potential successes in its pipeline. More specifically, Tarriff acknowledged that additional testing would be required prior to approval. Thus, Eagle effectively conceded that Kangio differed from Angiomax as previously disclosed extent, thereby requiring expensive and protracted human testing. This admission abandoned prior expectations of an abbreviated FDA approval process and a 2016 go-to-market strategy.

> . . . . Last quarter, we received the Complete Response Letter from FDA regarding our RTU bivalirudin product. ***We continue to be in discussions with the FDA about the design of a study that would support approval of the product. At a minimum, this is likely to increase the cost and extended timing of this development program.***

104. Indeed, Eagle's projections for ultimate regulatory approval have not regained the bullishness associated with the Company's prior statements. For example, on September 13, 2016, the Company presented a business overview at the Morgan Stanley Global Healthcare Conference. In the accompanying slide deck,

Eagle describes Kangio's prospects in faint terms, noting that the Company received the Complete Response Letter in March 2016 and that it was continuing to discuss human studies with the FDA. Such remarks stand in sharp contrast to Eagle's Class Period assessments, when the Company repeatedly assured investors that Kangio was merely a liquid form of the already approved Angiomax and that it foresaw no hurdles to FDA approval based on its ongoing dialogue with the FDA, even though the Company acknowledged that it had previously decided to forgo expensive and time consuming clinical tests.

## V. ADDITIONAL *SCIENTER* ALLEGATIONS

105. As alleged herein, Defendants acted with *scienter* in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own names during the Class Period, were materially false and misleading. Defendants knew what Kangio was and what it was not, and given Eagle's small size (just 41 employees as of December 31, 2015), any such knowledge was shared by all of Eagle's executives. Defendants also knew that they had tried to develop Kangio on a shoe string budget while employing minimal clinical testing, which diminished the likelihood that Kangio was receive FDA approval pursuant to the Section 505(b)(2) regulatory pathway.

106. Defendants, by virtue of their receipt of information reflecting the true facts regarding Eagle, their control over, and/or receipt and/or modification of Eagle's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

107. Defendants knew and/or recklessly disregarded the false and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including Defendant Tarriff.

108. More specifically, based on the frequent ongoing dialogue between Defendants and the FDA, Eagle knew about the FDA's questions and concerns regarding the Kangio NDA prior to receiving the FDA's complete response letter. Yet, Defendants did not disclose these concerns to investors, and instead, created the materially misleading impression that FDA approval was imminent based on the minimal changes required to the existing brand formulation of Bivalirudin.

109. Defendant Tarriff, because of his position at Eagle, controlled the contents of Eagle's public statements during the Class Period. Defendant Tarriff was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity

to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information, Defendant Tarriff knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Eagle's corporate statements and are, therefore, responsible and liable for the representations contained therein.

110. In addition, the *scienter* of the Individual Defendant Tarriff is additionally supported by the fact that, as disclosed in the Company's Form 10-K annual report for 2015, the Company had only 41 full-time employees as of December 31, 2015. This raises a strong inference that Tarriff, who was the Company's founder, CEO and a board member, was intimately familiar with all material aspects of the Company's operations and development pipeline.

111. Furthermore, as alleged above (*see* Section IV.B, *supra*), Tarriff embraced the Company's small size – suggesting that it promoted "camaraderie" and an ability to "make quicker decisions" – the results of which could be observed "more rapidly." Accordingly, this is not a case where a fraud occurred at a distant subsidiary or was committed by lower-level employees who did not report directly to senior management. Tarriff was acutely aware of Eagle's operations, and its success and failures. Additionally, Tarriff held himself out to the SEC and the public

as having knowledge of and involvement in the FDA approval process (*see generally* Section IV.D, *supra*).

112. Moreover, as set forth in the Form Def 14A that the Company filed with the SEC on July 12, 2016, 10% of Tarriff's 2015 incentive based compensation plan was contingent in part on the Kangio NDA being filed and accepted by the FDA. Consequently, Tarriff and other Eagle executives had a strong financial incentive not only to monitor the development of Kangio but to ensure that the NDA was timely filed, even if the application did not actually warrant approval.

113. Defendant Tarriff also engaged in substantial insider sales of Eagle stock during the Class Period, netting proceeds exceeding ***$9.50 million***, and which further supports inferences of his *scienter*. Specifically, Tarriff executed the following Class Period sales of Eagle stock:

| Tarriff's Class Period Transactions | | | |
|---|---|---|---|
| **Date** | **# Shares Sold** | **Price** | **Proceeds** |
| 7/1/2015 | 4,502 | $81.50 | $366,913.00 |
| 7/1/2015 | 1,483 | $80.28 | $119,055.24 |
| 7/1/2015 | 6,015 | $78.98 | $475,064.70 |
| 7/1/2015 | 3,710 | $77.58 | $287,821.80 |
| 9/1/2015 | 2,526 | $77.93 | $196,851.18 |
| 9/1/2015 | 11,792 | $76.88 | $906,568.96 |
| 9/1/2015 | 1,878 | $76.09 | $142,897.02 |
| 9/1/2015 | 49 | $75.12 | $3,680.88 |
| 10/1/2015 | 3 | $74.335 | $223.01 |
| 10/1/2015 | 1,548 | $72.67 | $112,493.16 |
| 10/1/2015 | 7.027 | $70.28 | $493.86 |
| 10/1/2015 | 8,235 | $69.27 | $570,438.45 |
| 10/1/2015 | 1,065 | $68.50 | $72,952.50 |

| | | | |
|---|---|---|---|
| 11/2/2015 | 11,713 | $64.07 | $750,451.91 |
| 11/2/2015 | 7,626 | $65.50 | $499,503.00 |
| 12/1/2015 | 2,806 | $86.92 | $243,897.52 |
| 12/1/2015 | 4,744 | $87.85 | $416,760.40 |
| 12/1/2015 | 1,500 | $88.80 | $133,200.00 |
| 12/1/2015 | 3,700 | $90.99 | $336,663.00 |
| 12/1/2015 | 1,300 | $91.46 | $118,898.00 |
| 1/4/2016 | 11,776 | $85.65 | $1,008,614.40 |
| 1/4/2016 | 2,773 | $87.02 | $241,306.46 |
| 2/1/2016 | 5,376 | $66.03 | $354,977.28 |
| 2/1/2016 | 3,600 | $67.46 | $242,856.00 |
| 2/1/2016 | 5,260 | $68.52 | $360,415.20 |
| 2/1/2016 | 2,431 | $69.95 | $170,048.45 |
| 2/1/2016 | 1,702 | $71.84 | $122,271.68 |
| 3/1/2016 | 7,802 | $62.70 | $489,185.40 |
| 3/1/2016 | 11,978 | $63.52 | $760,842.56 |
| | | **Total Proceeds** | **$9,505,345.01** |

114. Moreover, during the final two weeks of the Class Period, Tarriff sold 19,780 shares of Eagle stock and netted ***$1,250,027.96.*** Approximately two weeks later, when the FDA's Complete Response Letter was revealed, these shares were worth just ***$860,430***. Similarly, the 128,900 shares of Eagle stock that Tarriff sold over the course of the Class Period for more than $9.5 million, were worth just approximately $5.6 million in the immediate aftermath of the Class Period.

115. Tarriff's March 2016 sales were made pursuant to a 10b-5 trading program initiated on June 1, 2015, or shortly after the Kangio NDA was submitted to the FDA, when the Company already knew that the FDA's PDUFA decision would be due. Notably, an April 2016 corporate overview presentation states that

Tarriff's 10b-5 plan was terminated, which raises the inference that these sales were orchestrated to minimize risk of loss based on the denial of the Kangio NDA.

116. Based on the foregoing, Defendants' *scienter* concerning such core operations – and, specifically, whether the FDA would approve the Kangio NDA – may be inferred.

## VI. MATERIALITY

117. Once the truth concerning the denial of the Kangio NDA was revealed, investor confidence in Eagle was shattered and an immediate decline in the price of Eagle shares ensued. On the first day of trading after the news of the Kangio NDA denial became publicly available, Eagle shares lost approximately 19% of their value − on extremely high trading volume of more than 2.499 million shares, falling from $53.68 per share on March 17, 2016 to close at $43.50 per share on March 18, 2016. Moreover, the March 18, 2016 intra-day low was $40.50 per share. This clearly demonstrates the impact that the FDA's denial of the Kangio NDA and the preceding materially false and misleading public statements had on the market's assessment of the value of Eagle's stock.

118. This sharp and immediate market reaction is an extremely practical and clear indicator of materiality.

119. Materiality is also evidenced by Eagle's own statements in the Form 10-K filed with the SEC on February 29, 2016. In this public filing, Eagle indicated

that if Kangio received regulatory approval in the first quarter of 2016, Eagle would benefit from being able to market a preferred generic product whose reference brand generated over $600 million in sales prior to the introduction of generic competition. As discussed above, investors reasonably believed that it the Company could capture even a fraction of this "lucrative" generic market would have a significant amount of revenues for Eagle whose total 2015 revenues totaled $65.227 million.

120. Moreover, Eagle's Statements in the Risk Factors Section of its Form 10-K filed with the SEC on February 29, 2016 also evidence the materiality of the FDA's denial of the Kangio NDA:

> ***We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.***
>
> Our business and future success are substantially dependent on our ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. ***Any delay or setback in the development of any of these product candidates could adversely affect our business.*** Our planned development, approval and commercialization of these product candidates may fail to be completed in a timely manner or at all. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. . . .
>
> ***If the FDA does not conclude that our product candidates satisfy the requirements for the 505(b)(2) regulatory approval pathway, or if the requirements for approval of any of our product candidates under Section 505(b)(2) are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.***

> We intend to seek FDA approval through the 505(b)(2) regulatory pathway for each of our product candidates described in this Annual Report on Form 10-K. The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the Federal Food, Drug and Cosmetic Act ("FDCA"). Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.
>
> ***If the FDA does not allow us to pursue the 505(b)(2) regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase.*** Moreover, the inability to pursue the 505(b)(2) regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue the 505(b)(2) regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.
>
> In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit under Section 505(b)(2).

121. Here, Eagle concedes that the FDA's denial of the Kangio NDA was material to Eagle's business, financial condition and results of operations.

## VII. LOSS CAUSATION

122. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the

price of Eagle common stock and operated as a fraud or deceit on Class Period purchasers of Eagle common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Eagle common stock declined significantly as the prior artificial inflation came out of the Company's stock price.

123. As a result of their purchases of Eagle common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Eagle common stock to trade at artificially inflated levels throughout the Class Period, trading as high as $104.17 share on August 5, 2015.

124. The truth was revealed on March 18, 2016, when, as alleged above, the Company issued a press release announcing that the FDA denied the Kangio NDA and required additional information prior to approval. As a result of the Company's March 18, 2016 revelations, Eagle's stock price plummeted 19% on unusually heavy trading volume, falling from a close of $53.68 per share on March 17, 2016, to a close of $43.50 per share on March 18, 2016, causing millions of dollars in investor losses. In the days that followed, Eagle stock continued to decline, sinking to $33.02 by April 12, 2016.

125. The market's negative reaction to Eagle's March 18, 2016 revelations is demonstrated by the following chart:




126. The timing and magnitude of Eagle's stock price decline from March 17, 2016 through March 18, 2016 negates any inference that the losses suffered by Plaintiffs were caused by changed market conditions, macroeconomic or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of Eagle's stock price from the NASDAQ Biotechnology Index, which is comprised of peer companies, as the revelation of the truth became known to the market.




127. By concealing from investors the adverse facts detailed above, Defendants presented a misleading picture of Eagle's business and future financial prospects. When the truth about the Company was revealed to the market, the price of Eagle common stock fell significantly. The declines in the price of Eagle common stock detailed herein removed the inflation therefrom, causing real economic loss to investors who had purchased Eagle common stock during the Class Period.

128. In addition, as described above, *see* Section IV.E, *supra*, analysts and investors directly attributed this price decline to the unexpected denial of the Kangio NDA and Defendants' prior false and misleading statements.

129. The declines in the price of Eagle common stock after the corrective disclosures (*see* ¶¶ 88, 124-26), came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Eagle common stock

negate any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

130. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Eagle common stock and the subsequent significant declines in the value of Eagle common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

131. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-

looking statement was authorized and/or approved by an executive officer of Eagle who knew that those statements were false when made.

## IX. CLASS ACTION ALLEGATIONS

132. Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and: (i) all persons other than Defendants who were purchasers of Eagle common stock between May 12, 2015 and March 18, 2016, inclusive (the "Class").

133. Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

134. The members of the Class are so numerous that joinder of all members is impracticable. More than six (6) million shares of Eagle common stock were outstanding during the Class Period. The precise number of Class members is unknown to Lead Plaintiffs at this time, but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Eagle and its transfer agent. Notice can be provided to such record owners by a combination of published notice and first class mail, using

techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

135. Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

136. Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

137. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

138. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants Eagle and Tarriff to the investing public during the Class Period were materially false and misleading;

c. whether Defendants acted with *scienter* in making false or misleading statements during the Class Period;

d. whether the price of Eagle common stock was artificially inflated during the Class Period; and

e. the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## X. LEAD PLAINTIFFS AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

139. At all relevant times, the market for Eagle common stock was an efficient market for the following reasons, among others:

a. Eagle common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient, national stock market;

b. as a regulated issuer, Eagle filed periodic public reports with the SEC and the NASDAQ;

c. Eagle regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Eagle was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

140. As a result of the foregoing, the market for Eagle common stock promptly digested current information regarding Eagle from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Eagle common stock during the Class Period suffered similar injury through their purchase of Eagle common stock at artificially inflated prices and a presumption of reliance applies.

## XI. CAUSES OF ACTION

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

141. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

142. During the Class Period, Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Eagle Pharmaceuticals securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

143. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Eagle Pharmaceuticals as specified herein.

144. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eagle Pharmaceuticals' value and performance and continued substantial growth, which included omitting to state material facts necessary in order to make the statements made about Eagle Pharmaceuticals and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business

that operated as a fraud and deceit upon the purchasers of Eagle Pharmaceuticals securities during the Class Period.

145. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the likelihood of Kangio's New Drug Application being rejected, thereby artificially inflating price of its securities.

146. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Eagle Pharmaceuticals securities was artificially inflated during the Class Period.

147. At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's drug, Kangio, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Eagle Pharmaceuticals securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

148. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

149. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
**Violation of Section 20(a) of the Exchange Act**
**Against Defendant Tarriff**

150. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

151. Defendant Tarriff acted as a controlling person of Eagle Pharmaceuticals within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Defendant Tarriff had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. Defendant Tarriff was provided with or had unlimited access to copies of the Company's reports,

press releases, public filings and other statements alleged by Lead Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

152. In particular, Defendant Tarriff had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

153. As set forth above, Eagle Pharmaceuticals and Defendant Tarriff each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

154. By virtue of his position as a controlling person, Defendant Tarriff is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Lead Plaintiffs as Lead Plaintiffs and certifying Lead Plaintiffs as class representative

under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## XIII. DEMAND FOR JURY TRIAL

Lead Plaintiffs hereby demand a trial by jury.

Dated: October 31, 2016

**KIRBY McINERNEY LLP**

*/s/ Thomas W. Elrod*

Ira M. Press (admitted *pro hac vice*)
Thomas W. Elrod
Karina Kosharskyy
825 Third Avenue, Floor 16
New York, NY 10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540
Email: ipress@kmllp.com
telrod@kmllp.com
kkosharskyy@kmllp.com

*Lead Counsel for Lead Plaintiffs*

**POMERANTZ LLP**
Matthew L. Tuccillo (admitted *pro hac vice*)
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: mltuccillo@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

*Additional Counsel for Lead Plaintiffs*